UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STEPHANIE SMARGISSO, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>AIR & LIQUID SYSTEMS<br>CORPORATION, et al.,<br><br>　　　　　Defendants. | Case No.  23-cv-01414-RFL<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART WARREN<br>PUMPS' AND IMO'S MOTIONS FOR<br>SUMMARY JUDGMENT; GRANTING<br>FOSTER WHEELER'S MOTION FOR<br>SUMMARY JUDGMENT AS TO NON-<br>PECUNIARY DAMAGES; GRANTING<br>IN PART AND DENYING IN PART<br>PLAINTIFFS' MOTIONS FOR<br>SUMMARY JUDGMENT AS TO<br>AFFIRMATIVE DEFENSES;<br>DENYING WARREN PUMPS'<br>*DAUBERT* MOTIONS AND MOTION<br>TO STRIKE ORTON'S TESTIMONY**<br><br>Re: Dkt. Nos. 124, 126, 128, 131, 132, 133,<br><br>134, 135, 136, 137 |

This wrongful death action concerns William Ankiel Jr.'s alleged exposure to asbestos-containing equipment during his service aboard a Navy vessel from 1974 to 1978.  Ankiel's successor in interest, Stephanie Smargisso, and Ankiel's children (collectively, "Plaintiffs") contend that this exposure caused Ankiel to develop mesothelioma and pass away shortly after his diagnosis.  Plaintiffs sued the equipment manufacturers, claiming that they are liable for damages under theories of negligence, strict liability, and breach of express and implied warranties.

Presently before the Court are three sets of motions.  The first set of motions include

1

Defendant Warren Pumps's ("Warren") motion to strike shipmate Terry Orton's testimony and motions to exclude the testimony of various experts.  (Dkt. Nos. 131-20, 134, 135.)  The second set consists of summary judgment motions filed by the various manufacturer defendants: Foster Wheeler Energy Corporation and Foster Wheeler LLC (collectively "Foster Wheeler"), Warren, and IMO Industries, Inc. ("IMO").  (Dkt. Nos. 126, 131, 137.)  The third set of motions are Plaintiffs' motions for summary judgment on Foster Wheeler, Redco Corporation ("Redco"), Warren, and IMO's affirmative defenses.  (Dkt. Nos. 124, 132, 133, 136.)

For the reasons set out below, Warren's evidentiary motions are **DENIED** (Dkt. Nos. 131-20, 134, 135.)  Warren and IMO's motions for summary judgment on the issue of causation are **DENIED**.  (Dkt. Nos. 131, 137.)  Warren's motion for summary judgment on the government contractor defense is **GRANTED** as to the design defect claims, and **DENIED** as to the failure to warn claims.  (Dkt. No. 131.)  Warren, IMO, and Foster Wheeler's motions for summary judgment are **GRANTED** as to Plaintiffs' claims for non-pecuniary damages.  (Dkt. No. 126, 131, 137.)  Plaintiffs' motions for summary judgment as to Foster Wheeler, Redco, Warren, and IMO's affirmative defenses are **GRANTED** as to the sophisticated user/intermediary and superseding cause defenses, and **DENIED** as to the government contractor defense.  (Dkt. Nos. 124, 132, 133, 136.)

## I.    BACKGROUND

Ankiel served in the U.S. Navy as a boiler technician aboard the *USS Hollister* from October 1975 to April 1978.  (Dkt. No. 144-2 at 4.)  As part of his work, he operated the boilers in the fire rooms, repaired equipment such as valves, pumps, and boilers, and cleaned machinery spaces for general upkeep.  *Id.*  In April 2022, Ankiel was diagnosed with malignant mesothelioma and passed away shortly after diagnosis.  (Dkt. No. 134-7.)  Plaintiffs assert that Ankiel's mesothelioma was caused by exposure to asbestos from his handling of various equipment components on the *USS Hollister*, including insulation, gaskets, and packing manufactured by Defendants.

## II.    DEFENDANT WARREN'S MOTION TO STRIKE ORTON'S TESTIMONY

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).  At the summary judgment stage, the focus is therefore not on the "admissibility of the evidence's form," but rather on the "admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

Warren objects to the admissibility of the re-direct examination of Terry Orton—who served aboard the *USS Hollister* with Ankiel from 1976–1978—on four grounds.[1]  The Court addresses them in turn.

First, Warren claims that Plaintiffs' counsel entered into a binding stipulation that Orton would not be a witness against Warren.  (Dkt. No. 131-20 at 4.)  During the cross-examination of Orton, the following exchange occurred:

> DEFENSE COUNSEL: The name Warren, have you ever heard of Warren?
>
> ORTON: W-A-R-R-E-N-T?
>
> DEFENSE COUNSEL: No.  W-A-R-R-E-N.
>
> ORTON: E-N, Warren.
>
> PLAINTIFFS' COUNSEL:  <u>Hey, Jim, he's not going to be a witness against you</u> –
>
> ORTON:  Yeah.
>
> PLAINTIFFS' COUNSEL:  <u>-- for any purpose.  Not for Warren.</u>
>
> DEFENSE COUNSEL:  Okay.  Well, then, damn, I don't have any more questions to you. I know you're disappointed.

(Dkt. No. 131-7 at 13 (emphasis added).)  Warren contends that it was improper for Plaintiffs' counsel to subsequently ask Orton about Warren products during re-direct examination and seeks to strike that testimony.  The Court declines to exclude Orton's testimony on that basis.  Even if

---

[1] Warren's filing of separate evidentiary objections violates Civil Local Rule 7-3(a), which requires evidentiary objections to be included within the page limits of the opposition brief. Although the brief will not be stricken this time, the Court cautions Warren that future non-compliance with the local rules may result in its briefs being stricken without further warning.

counsels' exchange above were sufficient to constitute a formal stipulation, the stipulation was withdrawn during the same deposition.  As such, Warren was not prejudiced in any way.  *See In re Durability Inc.*, 212 F.3d 551, 553 (10th Cir. 2000) (holding district court abused its discretion in not considering evidence submitted at the summary judgment stage even though it contradicted an earlier stipulation due to lack of prejudice).  This is not a case in which a party waited until partway through trial, or on appeal, to the contradict an earlier stipulation.  In fact, Warren was able to conduct re-cross examination of Orton immediately after the supposedly improper re-direct examination, curing any prejudice that resulted from the cross-examination that was cut short.

Second, as to Warren's argument that the re-direct examination was out of scope, the Court exercises its discretion to allow this line of questioning in light of the central nature of the issue and the lack of prejudice to Warren.  *See U.S. v. Lopez*, 575 F.2d 681, 686 (9th Cir. 1978).

Third, Warren seeks to strike Orton's re-direct testimony on the basis that counsel's questions were leading:

- I'm going to ask you about a named Warren.  Is that familiar to you?
- If Warren pumps were in your boiler room, did you work on them?
- If Warren pumps were in your boiler room and you worked on them, did you guys remove and replace asbestos packing and gaskets or not?
- How often?  Barely ever?  All the time?  Somewhere in between?

(Dkt. No. 131-8 at 13–14.)  Those questions were not leading because they did not suggest a correct or preferred answer.  *See* McCormick on Evidence § 6 (7th ed. 2014).

Lastly, Warren's objection to Orton's testimony under Federal Rule of Evidence 403 is overruled.  The probative value of the testimony is high, as it pertains to the central issue of causation, and the testimony is not unfairly prejudicial or confusing.  Warren is free to cross-examine Orton at trial about his initial reaction when asked about Warren by Warren's counsel, as compared to his later answers when the issue was broached on re-direct.

In sum, Warren's motion to strike Orton's testimony is denied.

## III.    DEFENDANT WARREN'S *DAUBERT* MOTIONS

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an

opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Expert testimony is admissible under Federal Rule of Evidence 702 if the expert is qualified and if the testimony is both relevant and reliable.  See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004).  Rule 702 "contemplates a broad conception of expert qualifications."  *Hangarter*, 373 F.3d at 1018 (emphasis in original).

Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also* Fed. R. Evid. 702.  Relevance, in turn "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted).  Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

### A.    Motion to Exclude Evidence and/or Testimony by Plaintiffs' Naval Experts

Warren moves to exclude specific evidence and testimony by Plaintiffs' naval experts Michael Poulson and Captain Arnold Moore.  In particular, Warren claims that both experts lack sufficient foundation and personal knowledge to assert that Ankiel was exposed to asbestos from working on Warren pumps.  (Dkt. No. 135-1 at 6.)  The motion is denied.  Both experts permissibly relied on the testimony of Ankiel's shipmates, combined with their expertise about naval operations, in forming their opinions.  (Dkt. No. 147 at 6.)

### 1.    Captain Arnold Moore

Warren specifically objects to this statement (and other statements to this effect) from

Captain Moore's report:

> When [Orton was] asked if he worked on Warren pumps if they were in his fire room he replied "Yes, we did."  He gave the same reply when asked if he and Ankiel removed and replaced asbestos packing and gaskets on these pumps.

(Dkt. No. 135-1 at 4 (quoting Dkt. No. 135-8 at 20).)  These statements are a reasonable

interpretation of Orton's testimony:  that is, that Orton saw Ankiel work on all the pumps in the

fire room, which would include Warren pumps if they were in that room.

Warren further contends that Captain Moore lacks a basis to opine on what work Ankiel

likely performed on Warren pumps.  No personal knowledge is required for such conclusions,

which may be based on Orton's testimony and Captain Moore's expert opinion about what the

job of a boiler engineer like Ankiel generally entails.  (Dkt. No. 135-8 at 4.)

Warren further attacks Captain Moore's expert report because it does not specify whether

any Warren products were on the *USS Hollister* during Ankiel's two-and-a-half years aboard the

ship.  (Dkt. No. 158 at 6.)  But what Captain Moore *does* say—that Warren's records indicate

two Warren pumps were specifically manufactured for the *Hollister* and that Warren supplied

replacement parts to the Navy in 1978—is certainly helpful to the trier of fact in interpreting the

records to evaluate whether Warren products were more likely than not to have been on the ship

during Ankiel's tenure.  (Dkt. No. 150-2 at 18–19, 35.)

Lastly, Warren points to two cases—*Deem v. Air & Liquid Sys. Corp.*, No. C17-5965

BHS, 2019 WL 6251040 (W.D. Wash. Nov. 22, 2019) and *Yaw v. Air & Liquid Sys. Corp.*, No.

C18-5405 BHS, 2019 WL 3531232 (W.D. Wash. Aug. 2, 2019)—in which Captain Moore

testified on similar issues and the court either dismissed Captain Moore's testimony or excluded

it altogether.  But neither of those cases presents the same issue as here.  In *Deem*, there was no

evidence the defendant's products were on the ship or any eyewitness testimony that the

decedent worked on the defendant's products.  *See Deem*, 2019 WL 6251040, at *5.  Similarly,

in *Yaw,* the plaintiff "failed to identify working on a specific location on a specific ship." *Yaw,*

2019 WL 3531232, at *9.  Here, there is evidence from which a reasonable jury could infer that it was more likely than not that Warren pumps were on Ankiel's ship during his tenure and that Ankiel worked on all the pumps in the boiler room.

### 2. Michael Poulson[2]

Defendant also objects to the following statements (and other similar statements) from Poulson's report:

> Ankiel preformed [sic] routine maintenance as well as emergency repairs as needed to the following equipment, including but not limited to: Foster Wheeler Boilers . . . [and] Warren Fire and Bilge Pumps[.]

(Dkt. No. 135-1 at 5 (quoting Dkt. No. 135-9 at 5).)

> "According to the depositions of Orton and Edwards, [Ankiel] spent numerous hours daily in the fireroom/engineering spaces [of the *USS Hollister*.]"

(Dkt. No. 158 at 8 (quoting Dkt. No. 135-9 at 6).)  Like Captain Moore's testimony above, these statements are reasonable inferences drawn from Orton's testimony, who stated that he and Ankiel worked on "everything in that boiler room," including Warren Pumps if they were in the room.  (Dkt. 150-4 at 3.)  Poulson, indeed, explains later on in his report that he relied on Orton and Edwards' depositions.  (Dkt. No. 135-9 at 5.)  Moreover, Poulson himself served as a Navy fireman who worked with boilers and various types of pumps.  (Dkt. 135-9 at 2.)  He is permitted to use his personal knowledge of shipboard operations to opine on the details of Ankiel's role as a boiler technician.  To the extent Warren believes these inferences are unreasonable, it may cross-examine Poulson at trial.

Accordingly, Warren's motion to exclude evidence and/or testimony by Plaintiffs' naval experts is denied.

### B. Motion to Exclude "Every Exposure" Testimony or Argument

Warren next seeks to exclude expert testimony or argument from several of Plaintiffs' experts on the basis that they rely on the "every exposure" theory.  (Dkt. No. 134 at 2.)  Under

---

[2] Although Plaintiffs do not address Poulson in their opposition brief, the Court must still independently assess the validity of Warren's objection to the evidence.

the "every exposure" theory, which the Ninth Circuit has rejected as viable theory of causation, every exposure to asbestos—no matter how insignificant—contributes to the total dose and is a substantial factor in causing disease.  *See, e.g.*, *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177 (9th Cir. 2016).  Warren further complains that Plaintiffs' experts fail to conduct "any quantitative dose reconstruction or analysis relating to Ankiel's purported asbestos exposures."  (Dkt. No. 134-1 at 3.)

### 1.    Dr. David Zhang

Dr. Zhang conducted a case-specific analysis drawing from Ankiel's shipmates' testimonies about the frequency and type of his exposure to conclude that, in total, Ankiel inhaled a significant amount of carcinogenic asbestos fibers while working on the ship.  Given the amount inhaled, Dr. Zhang concluded that the cumulative dose of asbestos to which Ankiel was subjected to on the ship was a substantial factor in causing his mesothelioma.  Such evidence is admissible, and useful to the jury in assessing causation.  And "just because [Dr. Zhang] did not perform a quantitative dose reconstruction does not mean that his opinion is necessarily deficient." *See Marcus v. Air & Liquid Sys. Corp.*, No. 22-CV-09058-HSG, 2024 WL 3171840, at *7 (N.D. Cal. June 24, 2024).  Dr. Zhang's report explains in detail how different doses of asbestos fibers can increase the risk of mesothelioma.  (Dkt. No. 134-7 at 11-14.)  That information is useful to the jury, particularly in combination with testimony from Dr. Perry Gottesfeld about the total amount of fibers likely inhaled by Ankiel from each of his activities aboard the ship.  (Dkt. No. 131-9 at 7, 10.)  Putting those two sources of information together, the jury can assess whether the level of cumulative exposure is likely to be high enough to have been a substantial factor in Ankiel's mesothelioma.

Dr. Zhang's report also opines that "each significant exposure [Ankiel] experienced contributed to the cumulative dose that caused the development of his pleural malignant mesothelioma," and that "cumulative significant exposures to each company's asbestos-containing products substantially contributed to the development of [Ankiel's] malignant mesothelioma."  (Dkt. No. 134-7 at 20.)  Warren objects that this opinion is an impermissible

"every exposure" opinion.  For the same reason courts have prohibited an "every exposure" opinion, "courts have also rejected [] the so-called 'cumulative exposure' theory—that every exposure which contributes to a plaintiff's cumulative exposure is a contributing cause to that plaintiff's asbestos-related disease." *Carpenter v. 3M Co.*, No. CV 20-11797-MWF (MAAX), 2022 WL 17885688, at *12 (C.D. Cal. Dec. 13, 2022).  Otherwise, experts would be rendering the "substantial factor" test meaningless by concluding that every exposure to asbestos, regardless of how minuscule, is a substantial factor in causing mesothelioma.  But Dr. Zhang's report does not so opine.  Instead, he opines that "each *significant* exposure" was a substantial factor, and he provides studies that describe the doses of asbestos fibers that correspond to higher levels of mesothelioma, so that the jury can assess which doses are significant enough to be a substantial factor.  That information is both helpful to the jury and does not constitute an impermissible "every exposure" opinion.

Thus, the Court finds that the opinions offered in Dr. Zhang's report are reliable, and finds them admissible under FRE 702 and *Daubert*.  At trial, Warren may still object to any testimony that relies on an "every exposure theory" or that goes beyond Dr. Zhang's report.  In particular, Warren accurately observes that Dr. Zhang does not offer opinions specific to Warren in his report.  Thus, Dr. Zhang cannot take the stand and opine, for instance, that Ankiel's exposure to Warren pumps specifically constituted a "substantial factor" in his developing mesothelioma because he did not offer that opinion in his report.  Fed. R. Civ. Pro. 37(c)(1).  Dr. Zhang may provide the jury with the principles, from the studies described above, by which the jury may make that assessment as to each defendant, including Warren, but Dr. Zhang cannot draw that connection directly for the jury because Dr. Zhang's report does not analyze whether the exposure from Warren was "significant" enough to constitute a substantial factor.

### 2.      Dr. Marty Kanarek

Dr. Kanarek's report is also admissible under FRE 702 and *Daubert*.  Warren complains that Dr. Kanarek's report does not contain specific references to Warren products, but it does not need to: Plaintiffs seek to use Dr. Kanarek as a general causation expert.  Moreover, while Dr.

Kanarek does not provide a quantitative dose reconstruction, his report is relevant and helpful to the jury in many other ways.  The report details the relationship between asbestos and mesothelioma generally; the relative potency of different types of asbestos fiber; the quantities of exposures that have led to mesothelioma; and studies documenting high quantities of fiber released during gasket removal replacement.  (Dkt. No. 134-8 at 29, 31, 35–41.)  The jury can combine this information with witness testimony regarding how many times Ankiel performed certain operations and the proportion of equipment that belonged to each defendant to get an estimate of the total dosage Ankiel was exposed to.

While Dr. Kanarek does state in his report that "there is no known safe level of exposure," (Dkt. No. 134-8 at 44), that is not an "every exposure" opinion.  Saying that there is no certain level of asbestos exposure known not to cause cancer is not the same as the converse: that every exposure will be a *substantial* factor in causing mesothelioma.

Again, as a general causation expert, Dr. Kanarek cannot take the stand at trial and testify that Ankiel's work around Warren pumps was a substantial factor in causing his mesothelioma.  But his report is nonetheless both relevant and reliable.

### 3.   Dr. Perry Gottesfeld and Dr. Arnold Brody[3]

Lastly, Warren's objections to Dr. Perry Gottesfeld and Dr. Brody's reports on the same grounds are likewise overruled.  Dr. Gottesfeld does not offer any opinions that come close to propounding the "any exposure" theory."  What he does offer—how much fiber is released from each type of activity that Ankiel may have engaged in while on the ship—is helpful to the jury.  (Dkt. No. 131-9 at 7, 10.)  Similarly, the bulk of Dr. Brody's report does not rely on an "any exposure" theory.  The most potentially objectionable statement is the following:

> "Lung cancer and mesothelioma are cumulative diseases. . . . Once a person develops an asbestos-related cancer, it is not possible to exclude any of the person's above-background exposures to asbestos from the causal chain.  Each exposure to asbestos that an individual with lung cancer or mesothelioma experienced in excess of a background

---

[3] Although Plaintiffs do not address Dr. Gottesfeld or Dr. Brody in their opposition brief, the Court must still independently assess the validity of Warren's objections to those experts.

level contributes to the development of the disease."

(Dkt. No. 134 at 22–23.) But again, saying that any above-background asbestos exposure contributes to the development of the disease is not saying that each above-background asbestos exposure was a *substantial* factor in developing the disease.

Accordingly, Warren's *Daubert* motions are denied.

## IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment permits a court to enter judgment on factually unsupported claims, see *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), and may also be used on affirmative defenses.  *Dam v. Gen'l. Elec. Co.*, 265 F.2d 612, 614 (9th Cir. 1958).  Granting summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party has the initial burden of demonstrating that summary judgment is proper.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate.  *See Celotex*, 477 U.S. at 322, 324, 106 S.Ct. 2548.  The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party.  *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Id.*; *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment.  *Anderson*, 477 U.S. at 252.  A party opposing summary judgment must come forward with "significant probative evidence tending to support its claim that material,

triable issues of fact remain." *Sanchez v. Vild*, 891 F.2d 240, 242 (1989).

The parties do not dispute that "federal maritime law—'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules'—governs this case." *McIndoe*, 817 F.3d 1170, 1173 (9th Cir. 2016) (citations omitted). "With admiralty jurisdiction comes the application of substantive admiralty law." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986). Such application, however, "does not result in automatic displacement of state law." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995). State law may be used to supplement federal maritime law so long as it "compatible with substantive maritime policies." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 207 (1996). But state law is generally not applied where it would be "inconsonant with the substance of federal maritime law." *Id.* at 207.

## B. Defendants' Motions for Summary Judgment

### 1. Causation

First, Warren and IMO argue that Plaintiffs' evidence cannot establish causation. To prove causation, Plaintiffs must show that (1) he was actually exposed to Defendants' asbestos-containing materials, and that (2) this exposure was a "substantial contributing factor" in causing his injury. *McIndoe*, 817 F.3d at 1174 (citation omitted).

***Actual exposure.*** Warren—which does not contest that its pumps were installed on the *USS Hollister* and contained asbestos components—argues that Plaintiffs' evidence is deficient because Plaintiffs fail to identify any particular Warren pump on which Ankiel specifically worked. (Dkt. 131-1 at 22.) But such evidence, while persuasive, is not necessary for a jury to reasonably conclude that Ankiel was exposed to Warren pumps during his time aboard the *USS Hollister*. *See Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1038 (D. Haw. 2013) ("[T]he court rejects Defendants' arguments that Plaintiffs must present direct evidence that Cabasug recalled working on a particular product by the Defendant."). Plaintiffs have produced plenty of other evidence that would support such a conclusion. Ankiel's shipmate, Orton, testified that he and

Ankiel worked on "everything in that boiler room," including pumps, "[a]lmost every day."[4] (Dkt. No. 150-4 at 4, 8.)  Orton even stated that he had a specific recollection of seeing Ankiel work on a Warren pump if such a pump were installed in the boiler room.  (Dkt. No. 150-4 at 19.)  Plaintiffs also present records indicating that Warren manufactured pumps for the *USS Hollister* and supplied replacement parts to the Navy in 1978.  (Dkt. No. 150-2 at 18-19, 35.)  Taken together, this is sufficient evidence for a reasonable jury to find that Ankiel was exposed to asbestos from Warren pumps.

IMO's moves for summary judgment on a slightly different theory.  IMO (formerly DeLaval) argues that Plaintiffs fail to show that any DeLaval replacement components—here, packing and gaskets made from asbestos—were in use on the ship during Ankiel's service.  (Dkt. 137 at 15.)  Again, IMO does not contest that DeLaval pumps were installed in the *USS Hollister's* fire room, or that its replacement parts contained asbestos.  Instead, IMO contends that the asbestos components *inside* the DeLaval pumps were unlikely to have been components manufactured by DeLaval, given the frequency with which such components are replaced and the Navy's purported tendency to purchase replacement parts from non-original equipment manufacturers.

Plaintiffs have produced much evidence to the contrary.  Ankiel's shipmates testified that based on their experience replacing gaskets as boiler technicians, gaskets for the DeLaval pump fit exactly and would not have fit gaskets for other brands of pumps on the ship.  (Dkt. No. 150-5 at 38; Dkt. No. 144-4 at 16.)  Moreover, Plaintiffs' expert Captain Moore testified that pump gaskets had to be made by hand—if not made by the original equipment manufacturer ("OEM"), who has pre-existing stamp molds—which is time consuming and more prone to error.  (Dkt. No. 137-2 at 49.)  There is also circumstantial evidence that the DeLaval pump onboard the *USS Hollister* used replacement DeLaval parts: testimony that most equipment manufacturers

---

[4] Although Warren correctly observes that Orton did not recall any details about the Warren pumps's appearance or what type of work Ankiel performed on those pumps specifically, that is not a basis for excluding his testimony.  It is up to the jury to decide how these gaps in knowledge should affect the weight given to Orton's testimony.

supplied replacement parts for their own equipment (Dkt. No. 144-6 at 8), examples of other pump manufacturers that supplied their own replacement packing and gaskets (Dkt. No. 144-3 at 5), and evidence that DeLaval supplied replacement gaskets to the Navy during an unspecified time period (Dkt. No. 144-8 at 3.)  This is more than enough evidence for a reasonable jury to infer that DeLaval pumps and gaskets were not interchangeable with other pumps and gaskets, that an exact fit was generally an indication that the replacement part was a pre-stamped part supplied by the OEM, and that it was common practice to use OEM replacement parts.  Those inferences support a reasonable conclusion that DeLaval replacement parts were more likely than not to have been present in the DeLaval pumps when Ankiel was on the ship.[5]

Furthermore, even if DeLaval had not supplied the replacement parts on the ship when Ankiel was on it, summary judgment is still not appropriate because a reasonable jury could find that Ankiel was exposed to asbestos-containing products that IMO required in order for its pumps to function.  "In the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger." *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 457 (2019).

As to the first prong, Plaintiffs present sufficient evidence from which a reasonable jury could infer that DeLaval "ma[de] the product with a part that the manufacturer kn[ew] [would] require replacement with a similar part." *Id.*  Captain Moore's report explains that according to DeLeval's own specifications, gaskets and packing for its pumps should be made from asbestos. (Dkt. No. 150-2 at 20.)  IMO's corporate representative testified that asbestos was removed from DeLeval's pump components once "they had a suitable replacement," and that some DeLeval

---

[5] At oral argument, IMO raised for the first time an argument that some pump gaskets in the Warren pumps were non-interchangeable and had to be pre-stamped to be an exact fit, whereas others were not.  IMO contended that the records definitively showed that any non-interchangeable replacement gaskets had been supplied by another company.  This argument, however, was not raised in IMO's briefing and is therefore waived.

pump gaskets contained asbestos until 1986.  (Dkt. No. 144-10 at 16–17.)  A reasonable jury could infer from that testimony that IMO believed there was no suitable non-asbestos replacement during Ankiel's time on the ship.

Plaintiffs raise a triable issue of fact as to the second and third prongs as well.  Plaintiffs present evidence that DeLaval had reason to know of the dangers of dust inhalation from working with asbestos-containing gaskets and packing in the 1930s through 1960s.  (Dkt. Nos. 144-18 through 144-21.)  They also present evidence that the Navy did not adequately appreciate the dangers of working with asbestos gaskets and packing at the time, as detailed in Section IV.B.2 below.  That is sufficient to raise a genuine issue of material fact as to both those prongs.  *See Spurlin v. Air & Liquid Sys. Corp.*, 537 F. Supp. 3d 1162, 1174 (S.D. Cal. 2021) (finding a triable issues on all three prongs on similar facts).  Thus, even if the jury found that replacement parts in the DeLaval pump were *not* made by DeLaval, the jury could still find IMO to be liable because its pumps required asbestos components.

Based on the above and construing the evidence in the light most favorable to Plaintiffs, the Court finds that there is sufficient evidence for a reasonable jury to find that Ankiel was exposed to Warren's and IMO's asbestos-containing products.

***Substantial factor.***  Having found there to be sufficient evidence of actual exposure, the Court must next evaluate whether a reasonable jury could find that any such exposure was more likely than not to be a substantial contributing factor to Ankiel's mesothelioma.  Plaintiffs bear the burden of showing that Ankiel had "substantial exposure to the relevant asbestos for a substantial period of time."  *McIndoe*, 817 F.3d at 1176.  "Evidence of only minimal exposure to asbestos is insufficient."  *Id.*  Rather, "there must be a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural."  *Id.* (internal quotation marks and citation omitted).

Warren and IMO argue that this case is analogous to *McIndoe*.  In *McIndoe*, the Ninth Circuit affirmed the district court's finding that the plaintiffs failed to show exposure to asbestos for a substantial period of time.  The court concluded that evidence suggesting "McIndoe was

'frequently' present during the removal of insulation" and "present 20–30 times during such removal" was not sufficient to satisfy the substantial factor test. *Id.* Moreover, the plaintiffs there failed to present any evidence of the amount or duration of asbestos exposure.

Here, unlike in *McIndoe*, Plaintiffs have presented evidence that for approximately two-and-a-half-years, Ankiel personally removed gaskets and packing "[a]lmost every day," far exceeding the "20–30 times" McIndoe was exposed to dust from similar activities. (Dkt. No. 150-4 at 4, 8.) As discussed above, Plaintiffs have already presented evidence that Ankiel worked on "everything" on the *USS Hollister*'s pump row, which, according to Orton's testimony and ship records, contained Warren and DeLaval pumps. Most of these routine jobs released dust, which was visible in the air and on hands and clothing. *See id.* at 6. By "applying basic math, a juror could infer that over the course of his two-year service in the [boiler] room, [Ankiel] was exposed to asbestos dust for thousands of hours." *Spurlin*, 537 F. Supp. 3d at 1177.

Plaintiffs have also provided expert testimony that establishes the amount of Plaintiffs' exposure to asbestos. Activities such as gasket removal and replacement have been shown to expose workers to between 1.7 to 6.8 asbestos fibers per cubic centimeter of air, far exceeding the OSHA Permissible Exposure Limit for asbestos of 0.1 fibers/cc. (Dkt. No. 131-10 at 38; Dkt. No. 131-9 at 7, 10 (providing a chart detailing estimated asbestos fiber exposure for each activity Ankiel may have engaged in).) Plaintiffs' experts calculated that over an eight-hour workday, this level of exposure would result in the worker inhaling roughly 16,000,000 long asbestos fibers (shown to be highly carcinogenic), plus billions or even trillions of shorter fibers (which still carry carcinogenic potential). (Dkt. No. 131-10 at 38–39.)

Plaintiffs' causation expert described studies showing a significantly increased risk of mesothelioma even from a much lower quantity of exposure to asbestos fibers than Ankiel's. (Dkt. 131-11 at 12–13.) In addition, after reviewing Ankiel's medical records and the deposition testimony in the case, Plaintiffs' expert opined that the cumulative exposures over two years "substantially contributed to the development of [Ankiel's] malignant mesothelioma." (Dkt. No. 131-11 at 21.)

Taken together, a reasonable jury would be able to infer from Plaintiffs' evidence that exposure to Warren and IMO products were each substantial factors in Ankiel's development of mesothelioma. Accordingly, Warren and IMO's motions for summary judgment based on causation are denied.

### 2.    Government Contractor Defense

Warren moves for summary judgment with respect to Plaintiffs' failure to warn and design defect claims based on a government contractor defense. Plaintiffs do not oppose Warren's motion as to the design defect claims; summary judgment is thus granted with respect to those claims. However, summary judgment is denied as to the failure to warn claims.

When state law would otherwise impose liability on a defendant's failure to warn or design defect, that law can be displaced when the defendant can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government. *Getz v. Boeing Co.*, 654 F.3d 852, 866–67 (9th Cir. 2011).

As a preliminary matter, both parties have produced enough evidence for a reasonable jury to draw either conclusion as to the government's state of knowledge about the dangers of asbestos. While Plaintiffs produce some evidence that the Navy regarded gaskets and packing as negligible sources of asbestos exposure (Dkt. No. 150-19 ¶ 48), and that the Navy did not consider asbestos to be a hazard generally until the 1970s (Dkt. No. 150-3 at 9), Warren has marshalled their own set of facts supporting the opposite conclusion. Warren presents evidence that the Navy commissioned studies and reports demonstrating high levels of asbestos exposure from installing and removing materials in firerooms and engine rooms. (Dkt. No. 150-19 at 31.) And Warren also provides expert evidence contending that the Navy knew of the dangers of asbestos generally. (Dkt. No. 150-19 ¶¶ 66–76 (stating that the Navy prescribed work practices to address potential hazards associated with exposure to dust from asbestos materials); Dkt. No. 131-18 ¶ 156 (detailing posters advising sailors to wear their respirators)).

The Navy's uncertain state of knowledge, in turn, creates a triable issue of fact as to the first prong of the *Getz* test.  To establish government approval, a defendant must show "more than a rubber stamp."  *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 748 (9th Cir. 1997) (citation omitted).  "The mere signature of a government employee on the 'approval line' of a contractor's [instruction manual], without more, does not establish the government contractor defense."  *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989) (rejecting the defense as to a design defect claim even though the Navy had approved the design specifications in question because the specifications had been left by the Navy to the contractor's discretion). While Warren has produced evidence that the Navy generally exercised control over and reviewed written communication regarding equipment it procured (Dkt. No. 131-12 at 59–63), there is no evidence of a particular review procedure in place or that such review was exercised for replacement equipment such as packing and gaskets.  Moreover, because the Navy's state of knowledge about the asbestos risks associated with packing and gaskets is disputed, it is also unclear whether the Navy's approval of technical manuals without asbestos warnings was due to conscious disregard (*i.e.*, exercising discretion), or wholesale delegation to the contractor and/or blind approval due to a lack of knowledge of the relevant dangers (*i.e.*, rubber stamping).

As there is a genuine dispute of material fact with respect to at least one prong of the *Getz* elements, Warren is not entitled to summary judgment based on a government contractor defense as to Plaintiffs' failure to warn claims.  Accordingly, the Court denies Defendants' motion for summary judgment on this basis.

### 3.    Non-Pecuniary Damages

In *Atlantic Sounding v. Townsend*, 557 U.S. 404 (2009), the Supreme Court identified a two-step framework for determining which types of damages a plaintiff can seek under general maritime law: (1) whether the relief sought has been historically available under general maritime law, and (2) whether any statute explicitly precludes the requested relief.  *Id.* at 407. More recently, in *The Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019), the Court reaffirmed this framework and added a third step based on whether "policy grounds" nevertheless compel

the requested damages.  *Id.* at 2283.  The Court further clarified that the analysis about what relief is available is "based on the particular claims involved."  *Id.* at 2278, 2283 (recognizing that different types of marine torts "have different origins and may on occasion call for application of slightly different principles and procedures").

   ***Punitive damages.***  Foster Wheeler, Warren, and IMO seek summary judgment on Plaintiffs' claims for punitive damages.[6]  While Plaintiffs cite authority that punitive damages were available for "various maritime torts stretching back to the 1800s," including marine trespass and intentional torts, they have not put forth any evidence that punitive damages were historically available for negligence and strict liability claims specifically—the claims at issue here.  (Dkt. No. 139 at 13.)  Thus, Plaintiffs fail to establish that the relief sought has been historically available under general maritime law.  *See Elorreaga v. Rockwell Automation, Inc.*, No. 21-CV-05696-HSG, 2022 WL 2528600, at *5 (N.D. Cal. July 7, 2022).

   Plaintiffs' failure to satisfy step one of the *Townsend* framework is "practically dispositive" of the unavailability of punitive damages.  *Batterton*, 139 S. Ct. at 2283.  As for policy grounds, without historical evidence that punitive damages are traditionally recoverable for negligence and strict liability claims, the Court must follow the command in *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), to promote "a uniform rule applicable to all actions for the same injury, whether under the Jones Act or the general maritime law."  *Id.* at 33.  Under the Jones Act, which is a parallel statutory scheme for maritime claims, Ankiel would be limited to pecuniary losses, and could not recover non-pecuniary damages.  *Batterton*, 139 S. Ct. at 2278.  Absent a clear historical pattern establishing a different result for the claims at issue here, this Court is obliged to "seek conformity with the policy preferences the political branches have expressed in legislation."  *Id.* at 2283 n. 6; *see also Spurlin*, 537 F. Supp. 3d at 1180.

   ***Other damages.***  Warren and Foster Wheeler seek summary judgment as to Plaintiffs'

---

[6] Although Plaintiffs' motion to strike Foster Wheeler's summary judgment motion as late-filed (Dkt. No. 128) is denied in the interests of justice, Foster Wheeler is cautioned to follow the Court's standing order regarding the timing of filings in the future.

claims for loss of consortium, and Warren additionally seeks summary judgment as to Plaintiffs' claims for damages associated with Mr. Ankiel's loss of future earnings and pain and suffering. Again, Plaintiffs produce no historical evidence demonstrating that any of these types of damages were routinely allowed in negligence and strict liability actions under maritime law.

Loss of future earnings is a type of pecuniary damages, which may be permitted under the parallel statutory scheme of the Jones Act. *See* 2 Am. Law Torts § 8:33. But Plaintiffs have brought this suit as a wrongful death action, and such damages are unavailable in wrongful death actions, which give survivors a right of action for losses *they* suffered as a result of the decedent's death, not injuries suffered by the decedent himself. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 117 F.3d 1477, 1480 (D.C. Cir. 1997) (applying maritime law), *aff'd sub nom. Dooley v. Korean Air Lines Co.*, 524 U.S. 116 (1998).

Accordingly, Defendants' motions for summary judgment are granted as to Plaintiffs' claims for punitive damages, loss of consortium, pain and suffering, and loss of future earnings.

### C.    Plaintiffs' Motions for Summary Judgment

#### 1.    Government Contractor Defense

Plaintiffs seek summary judgment on Defendants' government contractor defense as applied to the failure to warn claims.[7]  For the defense to apply, Defendants must satisfy the three-part test set out in *Getz* described above.  654 F.3d at 866–67.  A triable issue of fact remains with respect to each prong of the *Getz* test.  On the first prong—as explained in Section IV.B.2—a reasonable jury could find either that (1) the Navy exercised its discretion in excluding the asbestos warnings from Defendants' products, in which case the government contractor defense would apply, or (2) the Navy did not exercise its discretion in excluding the warnings but simply missed the issue due to its delegation of the issue to contractors or its lack of knowledge about the dangers of working with asbestos replacement parts, in which case the defense would not apply.  A reasonable jury could also find that the second prong, which

---

[7] Plaintiffs did not move for summary judgment as to Defendants' government contractor defense as applied to their design defect claims.

concerns whether the contractor provided the warnings required by the government, is satisfied based on Defendants' evidence that Navy procedures required government approval of warnings on all equipment.  Lastly, whether the government knew about the dangers of working with asbestos packing and gaskets remains a triable issue of fact.  *See* Section IV.B.2.  Plaintiffs' motions for summary judgment on this defense are therefore denied.

### 2.      Sophisticated User / Intermediary Defense

Summary judgment is granted in favor of Plaintiffs as to Defendants' affirmative defenses based on "sophisticated user" and "sophisticated intermediary" theories.

***Sophisticated user defense.***  The sophisticated user defense is "no more than an expression of common sense as to why a party should not be liable when no warnings or inadequate warnings are given to one who already knows or could reasonably have been expected to know of the danger." *Cabasug v. Crane Co.*, 988 F. Supp. 2d 1216, 1221 (D. Haw. 2013) (citation omitted).  None of the Defendants has produced direct evidence that Ankiel—just seventeen years old when he started working on this ship—knew of or could reasonably have been expected to know of the asbestos risks associated with replacing pump packing and gaskets.

The circumstantial evidence that Defendants did put forth does not support a reasonable inference of such knowledge either.  Warren and IMO argue that because the highest authorities in the Navy were tasked with ensuring sailors complied with an instruction handbook, a reasonable jury could infer that Ankiel was warned of the asbestos risks associated with his line of work.  (Dkt. No. 149 at 14.)  But while these instructions mention other asbestos hazards, nowhere do they indicate that packing and gaskets contained asbestos.  Nor do Defendants provide any evidence that these authorities held meetings or otherwise conveyed the message— to any sailors, let alone Ankiel specifically—that boiler room work could lead to asbestos exposure.  Indeed, there is no indication that any of the protective gear described in those instructions was ever provided to Ankiel or others like him, which undercuts an inference that the precautionary information from those instructions was provided either.  Warren further claims that the *USS Hollister*'s shipyard had a "robust industrial hygiene program that dealt with

21

asbestos hazards." (Dkt. No. 149 at 14.) But aside from a poster instructing sailors to wear their respirators—dated over 10 years before Ankiel's service—and a study that seems to have been published in an academic journal, there is no evidence that Ankiel benefitted from this hygiene program. Due to the lack of any supporting direct or circumstantial evidence from which a jury could reasonably infer that Ankiel knew or could reasonably be expected to know of the dangers at issue, summary judgment is proper as to Defendants' sophisticated user defense. *Cf. Cabasug*, 988 F. Supp. 2d at 1223–24 (denying summary judgment on the sophisticated user defense when defendants produced evidence of specific safety meetings plaintiff attended and plaintiff's own admission that he understood asbestos could be hazardous).

      ***Sophisticated intermediary defense.*** Manufacturers of a product are absolved from liability caused to an ultimate end-user (here, Ankiel) if they establish that they: (1) knew that an intermediary (i.e., the Navy) was aware of the dangers of asbestos, and (2) reasonably concluded that the intermediary would provide warnings to its employees. *Cabasug*, 988 F. Supp. 2d at 1219. Although Defendants produce evidence that the Navy knew generally of the dangers of asbestos, there is no evidence in the record that supports an inference that *Defendants* knew of the Navy's state of knowledge at the time. And while some of the relevant studies were published in journals, a reasonable jury could not infer from that bare fact that Defendants knew either of the Navy's review of those studies or the Navy's overall state of awareness concerning the dangers of asbestos. Nor do Defendants show that they had reason to believe that the Navy would take affirmative steps to warn its employees about the dangers of servicing the equipment at issue.[8]

###       3.      Superseding Cause Defense

    Summary judgment is also granted in Plaintiffs' favor as to Defendants' superseding cause defense. Defendants have not presented evidence sufficient to create a disputed issue of material

---

[8] Because Defendants do not submit sufficient evidence to sustain a sophisticated intermediary defense, the Court does not reach the question whether such a defense would be available in maritime law cases involving asbestos. *See Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 339–43 (E.D. Pa. 2012); *Spurlin*, 537 F. Supp. 3d at 1182.

fact as to whether the Navy's failure to warn was unforeseeable in light of Defendants' failure to provide warnings.

"The doctrine of superseding cause is applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable.  It is properly applied in admiralty cases." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) (alterations omitted) (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3 at 165–166 (2d ed. 1994)).  "Superseding cause operates to cut off the liability of an admittedly negligent defendant." *Id.* at 837–38 (citation omitted).

The Restatement (Second) of Torts § 442 provides a list of considerations that are important in determining whether the intervening force was foreseeable.  Particularly relevant here are:

> (a) whether the intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation[.]

Defendants have failed to produce any evidence demonstrating that the Navy's failure to warn was unforeseeable or that it produced harm that was "different in kind."  Moreover, that the Navy knew about the risks of asbestos at the time—which itself is a disputed fact—is not enough to render its failure to warn "extraordinary."  *See In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806, 815 (9th Cir. 1992) (holding district court correctly ruled that Navy's failure to warn did not absolve defendants of liability for plaintiff's asbestos-related injuries because defendants failed to adduce any evidence suggesting the Navy's actions were extraordinary or unforeseeable).

## V.   CONCLUSION

In sum, Warren's, IMO's, and Foster Wheeler's motions to strike Plaintiffs' claims for non-pecuniary damages are **GRANTED**.  (Dkt. Nos. 126, 131, 137.)  Warren's motion for summary judgment in its favor on the government contractor defense as applied to the design defect claims is also **GRANTED**.  (Dkt. No. 131.)  Plaintiffs' motions for summary judgment on

the sophisticated user/intermediary and superseding cause defenses are **GRANTED**.  (Dkt. Nos. 124, 132, 133, 136.)  The remaining motions are **DENIED**.

       **IT IS SO ORDERED.**

Dated: September 26, 2024

 

_____
RITA F. LIN
United States District Judge